UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EMILY'S PLACE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:24-CV-1251-B |
| | § | |
| REGIONS BANK, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Regions Bank's Amended Motion to Stay Proceedings and Compel Arbitration (Doc. 6). For the following reasons, the Court **GRANTS** the Motion.

I.

BACKGROUND

This is a fraud case. Plaintiff Emily's Place, Inc. ("Emily's Place")'s former CEO, Brandi Lynn Bruno, transferred millions of dollars of Emily's Place's money to her own personal accounts by opening an account at Regions Bank and giving herself sole access to this account. Doc. 1-2, Pet., ¶¶ 14–15. Emily's Place sued Regions Bank under negligence, fraud, and breach of fiduciary duty theories. *Id.* ¶¶ 29–38.

Emily's Place is a non-profit that provides care for women and their children fleeing domestic violence. Doc. 1-2, Pet., ¶ 11. Emily's Place had seven bank accounts with Regions Bank, all of which were governed by the same agreement ("the Agreement"). Doc. 1-2, Ex. 2, 18.[1] The Agreement

---

[1] The numbers refer to ECF pagination.

required arbitration at the election of either party. *Id.* at 29. And any use of a Regions Bank account constituted acceptance of the Agreement, including its arbitration provisions. *Id.* at 28, 29.

Emily's Place hired Bruno as its Executive Director in 2018 and promoted her to CEO in 2022. Doc. 1-2, Pet., ¶ 13. Before Bruno became the CEO, Emily's Place made her one of two authorized signers for Emily's Place's bank accounts at Regions Bank. *See* Doc. 6-3, Ex. 3; Doc. 6-4, Ex. 4; Doc. 6-5, Ex. 5. Emily's Place's policy required two signatories to open a bank account. Doc. 11, Pl.'s App'x, 4. On April 4, 2023, though, Bruno opened a Regions Bank deposit account ("the Account") as the sole signatory. Doc. 1-2, Pet., ¶¶ 14, 16–17; *see also* Doc. 11, Pl.'s App'x, 57. This is the Account at issue in this lawsuit. She then transferred millions of dollars of Emily's Place's funds to personal accounts and overdrew the Account by $991,000. Doc. 1-2, Pet., ¶¶ 15, 26. Emily's Place suspended her without pay in July 2023. *Id.* ¶ 13.

To open the Account, Bruno consented to the Agreement governing all of Emily's Place's accounts at Regions Bank. The Agreement included a provision requiring arbitration. Doc. 6, Am. Mot., 10; Doc. 1-2, Ex. 2, 18. It provides:

> Except as expressly provided herein, you and we agree that either party may elect to resolve by BINDING ARBITRATION any controversy, claim, counterclaim, dispute, or disagreement between you and us, . . . Claim has the broadest possible meaning and includes, but is not limited to, any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to any one or more of the following: . . . (2) any account . . . .

*Id.* Regions Bank initiated an arbitration proceeding against Emily's Place in March 2024 to recover $2,277,131.93 in overdraft, late fees, and penalties related to the Account. Doc. 1-2, Pet., ¶ 7. The next month, Emily's Place sued Regions Bank in Texas state court. *See generally id.* Regions Bank moved to compel arbitration and stay the case during arbitration proceedings. Doc 6, Am. Mot. The Court considers the Motion below.

## II.

## LEGAL STANDARD

*A.     The Federal Arbitration Act*

Under the Federal Arbitration Act ("FAA"), arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 4. A party can petition the court for an order directing arbitration. *Id.* Courts employ a two-step inquiry when adjudicating a motion to compel arbitration. *See Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002). The first step asks whether the "parties agreed to arbitrate the dispute in question." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996). This involves determining whether the parties entered into an arbitration agreement and whether the dispute falls within the scope of that agreement. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis omitted). Second, if the court finds that the parties agreed to arbitrate, then the court "must determine whether any federal statute or policy renders the claims nonarbitrable." *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007) (quotations omitted).

*B.     Motions to Compel Arbitration*

"[W]here a party attacks the very existence of an agreement" to arbitrate, "the courts must first resolve that dispute." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 219 (5th Cir. 2003). "The party seeking arbitration has the burden of establishing the existence of an agreement to arbitrate." *Est. of Benitez v. Sears, Roebuck & Co.*, 2013 WL 4223875, at *2 (N.D. Tex. Aug. 14, 2013) (Fitzwater, C.J.). The legal standard for motions to compel arbitration is unsettled in the Fifth Circuit. *See Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443 (N.D. Tex. 2019)

(Ramirez, M.J.). Some courts have used a summary judgment standard. *See id.* at 444. Courts applying this approach have determined that "the moving party must first present evidence sufficient to demonstrate . . . merely that [an arbitration agreement] existed." *Id.* at 445 (quotations omitted).

Once the movant has shown that an arbitration agreement exists, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Signal Ridge Owners Ass'n, Inc. v. Landmark Am. Ins. Co.*, 657 F. Supp. 3d 866, 873 (N.D. Tex. 2023) (Fitzwater, J.) (quoting *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004)). To attack the existence of an arbitration agreement, a party must first put the making of the agreement in issue by "unequivocally deny[ing] that he agreed to arbitrate and produc[ing] some evidence supporting his position." *Chester v. DirecTV, L.L.C.*, 607 F. App'x 362, 364 (5th Cir. 2015) (internal quotations and alterations omitted).

Although "[t]he quantum of evidence required to prove or disprove the existence of an agreement to arbitrate is not entirely clear in this Circuit," *Gallagher v. Vokey*, 860 F. App'x 354, 357 (5th Cir. 2021), "[t]he party resisting arbitration bears the burden of showing that he is entitled to a jury trial under § 4 of the Arbitration Act." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992) (quotations omitted). To meet this burden, "the party must make at least some showing that under prevailing law, he would be relieved of his contractual obligation to arbitrate if his allegations proved to be true and he must produce at least some evidence to substantiate his factual allegations." *Gallagher*, 860 F. App'x at 357 (quotations and alterations omitted). Courts applying the summary judgment-like standard have noted that "a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests;

-4-

the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Jackson*, 398 F. Supp. 3d at 445.

### III.

### ANALYSIS

The Court **GRANTS** Regions Bank's Motion to Compel Arbitration. The Court finds that the parties formed a valid arbitration agreement, and the agreement applies to this dispute. Furthermore, no federal statute or policy renders Emily's Place's claims nonarbitrable. Finally, Emily's Place's contract defenses do not render the arbitration agreement unenforceable.

A.  *The Parties Formed an Arbitration Agreement.*

The Court finds that Regions Bank established that an agreement to arbitrate exists. *See Est. of Benitez*, 2013 WL 4223875, at *2. To determine whether an agreement to arbitrate exists, courts apply "ordinary state-law principles that govern the formation of contracts." *Will-Drill*, 352 F.3d at 216 (quotations omitted). The parties do not dispute that Texas law applies. *See* Doc. 6, Am. Mot.; Doc. 10, Pl.'s Resp. In Texas, a contract requires, "(1) offer; (2) acceptance in strict compliance with the offer's terms; (3) a meeting of the minds; (4) consent by both parties; (5) execution and delivery; and (6) consideration." *Nazareth Hall Nursing Ctr. v. Melendez*, 372 S.W.3d 301, 305 (Tex. App.—El Paso 2012, no pet.).

Emily's Place had a longstanding banking relationship with Regions Bank. *See* Doc. 1-2, Ex. 2, 18; *see also* Doc. 10, Pl.'s Resp., 5, 13; Doc. 6, Am. Mot., 11. It held seven accounts with Regions Bank, all of which were governed by the same Agreement. Doc. 1-2, Ex. 2, 18. Emily's Place does not dispute that the Agreement applies to its other accounts. The Agreement states that "by opening or modifying an account electronically, by depositing funds into, or withdrawing funds from, any

account, . . . [and] by using an account with us, . . . you agree to the terms of this Agreement." *Id.* at 29. The agreement further provides that "acceptance of this agreement includes . . . acceptance of and agreement to [arbitration] provisions" in the Agreement. *Id.* at 28. Emily's Place conducted its banking with Regions Bank using the accounts governed by this Agreement for multiple years. *Id.* at 18. Therefore, the Court finds that Region Bank established that an arbitration agreement exists.

Although Emily's Place disputes that it entered the specific Agreement governing the Account that Bruno opened, it does not dispute that its other accounts are governed by an identical Agreement. Emily's Place focuses entirely on the specific Agreement that governed the Account Bruno opened. *See* Doc. 10, Pl.'s Resp., 4–15. But it does not dispute that an identical Agreement governed its various other bank accounts with Regions Bank. Emily's Place asserts that "no valid arbitration agreement exists between Regions and Emily's Place," Doc. 10, Pl.'s Resp., 6. But it produced no evidence that it did not agree to arbitrate disputes about its other Regions Bank accounts. *See Chester*, 607 F. App'x at 364. A general denial, absent specific evidence, fails. *See Jackson*, 398 F. Supp. 3d at 445. Therefore, because Regions Bank established that an arbitration agreement existed, and Emily's Place has not carried its burden to establish the Agreement's invalidity, the Court finds that the parties had a valid arbitration agreement. *See Signal Ridge*, 657 F. Supp. 3d at 873. The Court need not address whether Emily's Place is also bound by the Agreement in the Account that Bruno opened because, as the Court discusses below, the Agreement applies to disputes related to any of Emily's Place's accounts at Regions Bank.

B.     *The Arbitration Agreement Applies to this Dispute.*

Having determined that a valid arbitration agreement exists, the Court determines that this dispute falls within the scope of the agreement. Only at this step does the strong federal policy

favoring arbitration come into play. *See PoolRe Ins. Corp. v. Org. Strategies*, Inc., No. CIV.A. H-13-1857, 2013 WL 3929077, at *6 (S.D. Tex. July 29, 2013), *aff'd*, 783 F.3d 256 (5th Cir. 2015). At this step, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). To determine an arbitration clause's scope, courts ascertain whether it is narrow or broad. *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998). A narrow clause "only require[s] arbitration of disputes arising out of the contract," while "broad" clauses require arbitration of "all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.* An arbitration clause is "broad" when it contains "relating to" language. *See Hawk v. Spaghetti Warehouse Rests., Inc.*, No. CIV.3:03-CV-0399-H, 2003 WL 21246138, at *3 (N.D. Tex. May 1, 2003) (Sanders, J.).

The Agreement covering Emily's Place's various bank accounts is broad and therefore requires that the parties arbitrate this dispute. The Agreement provides:

> Except as expressly provided herein, you and we agree that either party may elect to resolve by BINDING ARBITRATION any controversy, claim, counterclaim, dispute, or disagreement between you and us, . . . *Claim has the broadest possible meaning* and includes, but is not limited to, any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or *relating to* any one or more of the following: . . . (2) any account . . . .

Doc. 1-2, Ex. 2, 29 (emphasis added). The Agreement contains "relating to" language. *Id.* And it requires that parties arbitrate claims at the other party's election, giving "claim" its "broadest possible meaning." *Id.* The Agreement thus contains a broad arbitration clause.

This dispute is related to the Agreement. *See Pennzoil*, 139 F.3d at 1067. As the Court discussed above, Emily's Place does not dispute that the same Agreement governs its other bank accounts with Regions Bank. Emily's Place's fraud, negligence, and breach of fiduciary

claims pertain to a bank account that was in its name at Regions Bank. Because this dispute involves one of its accounts at Regions Bank, the dispute relates to the Agreement.

And by its own terms, this broad arbitration agreement requires the parties to arbitrate this dispute. Emily's Place alleges that Regions Bank breached duties and committed fraud when it allowed Bruno to open an account and transfer funds from Emily's Place to Bruno's own personal accounts. Doc. 1-2, Pet., ¶¶ 29–38. The Court finds that this is a "claim . . . relating to . . . [an] account." Doc. 1-2, Ex. 2, 29. The Agreement does not require that the account be one that Emily's Place opened or held. It only requires that the dispute relate to "any account." *Id.*; *see also Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 36 (5th Cir. 1990) ("We have held that arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." (quotations omitted)). The Agreement thus applies to the Account at issue here.

C.    *No Federal Statute or Policy Renders Emily's Place's Claims Nonarbitrable.*

Neither party has pointed to any federal statute or policy rendering Emily's Place's claims nonarbitrable. *See Conegie*, 492 F.3d at 598. And the Court is not aware of any. Therefore, the Court finds that the parties must arbitrate this dispute.

D.    *Emily's Place's Contract Defenses Do Not Apply.*

Emily's Place raises two contract defenses, but both fail. First, it argues that the arbitration agreement was formed as a mutual mistake. Doc. 10, Pl.'s Resp., 9–10. Second, it argues that the agreement is procedurally and substantively unconscionable. *Id.* at 10–15. The Court considers each

in turn, applying Texas law, which the parties do not dispute applies to these contract defenses. *See* Doc. 10, Pl.'s Resp., 9–15; Doc. 12, Def.'s Reply, 4–7.

### 1.  The Agreement Was Not Formed as a Result of a Mutual Mistake.

The Agreement did not result from a mutual mistake. Emily's Place only raises mutual mistake as a defense to the specific Agreement that governed the Account Bruno opened. *See* Doc. 10, Pl.'s Resp., 9–10. But it does not assert that the Agreement governing its other accounts was also formed as a mutual mistake. *See id.* As the Court discussed above, the Agreement governing Emily's Place's other accounts requires it to arbitrate this dispute. Emily's Place's mutual mistake defense thus fails.

### 2.  The Agreement Is Not Unconscionable.[2]

Neither is the Agreement unconscionable. Unconscionable contracts are unenforceable under Texas law. *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). A contract is unconscionable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001). The unconscionability defense "prevent[s] oppression and surprise" that can result from unequal bargaining power. *Id.* Texas recognizes both procedural and substantive unconscionability. *In re Olshan Found. Repair Co.*, LLC, 328 S.W.3d 883, 892 (Tex. 2010). Substantive unconscionability

---

[2] In its Reply, Regions Bank for the first time argues that there is a delegation clause that delegates questions of unconscionability, among other things, to the arbitrator. *See* Doc. 12, Reply, 5–6. "Courts may not assume that parties have agreed to arbitrate threshold questions absent clear and unmistakable evidence of their intent to do so." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 551–52 (5th Cir. 2018). Because Regions Bank first raises this delegation issue in its Reply, the briefing is insufficient for the Court to determine whether there is "clear and unmistakable evidence" that the parties delegated unconscionability questions to the arbitrator. *See id.*

describes "the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *Id.* (quoting *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006)).

The arbitration agreement is not procedurally unconscionable. Emily's Place raises this defense only with respect to Bruno agreeing to the Agreement. Doc. 10, Pl.'s Resp., 11. Emily's Place does not argue that the earlier Agreements were procedurally unconscionable. And because the earlier iterations of the Agreement bind Emily's Place to arbitrate this dispute, the Court rejects the procedural unconscionability defense.

Neither was the arbitration agreement substantively unconscionable. "Because [Emily's Place] complain[s] of the prohibitive cost of arbitration, [its] claim is grounded in substantive unconscionability." *In re Olshan*, 328 S.W.3d at 892. To show that arbitration costs are prohibitively expensive, and therefore unconscionable, Emily's Place must show some evidence that it is likely to incur those costs, and it must show some evidence that the costs would be so high "as to deter enforcement of statutory rights in the arbitral forum." *Id.* at 893 (quoting *Poly-Am.*, 262 S.W.3d at 356). Arbitration is meant to resolve disputes more cheaply and quickly than litigation. *Poly-Am.*, 262 S.W.3d at 347. Texas courts are thus "wary of setting the bar for holding arbitration clauses unconscionable too low." *See In re Olshan*, 328 S.W.3d at 892.

Here, Emily's Place has not shown evidence that arbitration would be so costly that it would deter enforcement of its rights. *See id.* Emily's Place argues that the Agreement requires Emily's Place to pay $15,817 in administrative fees and $250–$750 per hour to each of three arbitrators. Doc. 10, Pl.'s Resp., 18–19. It estimates the hourly fees would total $22,500. *Id.* at 19. And it argues these "costs are not comparable to the costs of litigation." *Id.* at 20. The Court finds that this "'risk' that

[Emily's Place] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Poly-Am.*, 262 S.W.3d at 356. Furthermore, the arbitrator may still determine whether the cost provisions in the Agreement "will hinder effective vindication of [Emily's Place's] statutory rights and, if so, modify the contract's terms accordingly." *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422–23 (Tex. 2010) (quotations and alterations omitted). Therefore, the Court finds the agreement is not substantively unconscionable.

"When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit . . . ." *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024). Instead, it must stay the proceeding. *Id.* at 476. Because the Court finds that this dispute is subject to arbitration, it also grants Regions Banks's Motion to stay proceedings.

### IV.

### CONCLUSION

Accordingly, Regions Bank's Amended Motion to Stay Proceedings and Compel Arbitration (Doc. 6) is **GRANTED**. The case is hereby **STAYED**. The Court **ORDERS** that this case is administratively closed pending resolution of the arbitration. The Parties must file a joint status report every 120 days, beginning 120 days from the date of this Order, updating the Court on the status of their arbitration.

SO ORDERED.

SIGNED: January 30, 2025.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-11-